[Cite as *Georgalis v. Cloak Factory Condominium Unit Owners' Assn.*, 2021-Ohio-66.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

GUS GEORGALIS, TRUSTEE OF THE  :
ARAHOVA TRUST, ETC.,

      Plaintiff-Appellant,      :

                                 No. 109300

v.                     :

CLOAK FACTORY CONDOMINIUM    :
UNIT OWNERS' ASSOCIATION,

      Defendant-Appellee.      :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 14, 2021

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-17-888961

---

*Appearances:*

The Brunn Law Firm Co., L.P.A., Thomas L. Brunn, Jr.,
and Alison D. Ramsey, *for appellant*.

Ott & Associates Co., L.P.A., Steven M. Ott, and Christina
Pochemsaniy, *for appellee.*

MARY J. BOYLE, A.J.:

{¶ 1} Plaintiff-appellant, Gus Georgalis, trustee of the Arahova trust,

satisfied on September 21, 2006, and continuing the original trust of Nikolas and

Katina Georgalis dated August 1, 1992 ("trust"), appeals the trial court's decision granting partial summary judgment to defendant-appellee, the Cloak Factory Condominium Unit Owners' Association, Inc. ("association"). Georgalis raises one assignment of error for our review:

> The trial court erred in granting appellee, [the association's], motion for partial summary judgment.

{¶ 2} Finding no merit to his assignment of error, we affirm the judgment of the trial court.

## I. Procedural History and Factual Background

{¶ 3} 635 W. Lakeside Ave., Ltd. is the declarant and the developer of condominium property known as The Cloak Factory Condominium ("Cloak Factory"), which consists of 28 units and is located at 635 W. Lakeside Ave., Cleveland, Ohio. Georgalis was the sole member and controlling officer of 635 W. Lakeside Ave., Ltd. Georgalis executed the Declaration of Condominium Ownership as a "member" of 635 W. Lakeside Ave., Ltd., on November 14, 2006, and recorded it approximately one month later. The declaration established the association as required by R.C. Chapter 5311. Georgalis also executed and recorded the bylaws of the association simultaneously. The association administers the Cloak Factory and is governed by the declaration and bylaws.

{¶ 4} The trust, as successor in interest to the developer, still owns five units: the basement unit (also referred to as unit 126A or 150), two units on the first floor, 100 and 101, and two units on the sixth floor, 600A and 602.[1]

{¶ 5} In November 2017, Georgalis filed a complaint against the association for breach of contract, violation of R.C. 5311.23 (liability for failure to comply with condominium instruments), and slander of title. As relevant to this appeal, Georgalis alleged that the association breached the declaration by continuing to improperly assess the trust's basement and first floor units for their share of the parking lease expenses.

{¶ 6} In March 2019, the association moved for partial summary judgment with respect to Georgalis's breach of contract claims. Georgalis opposed the association's motion.

---

[1] According to findings of fact made by the court in Cuyahoga C.P. No. CV-15-841708, Georgalis, as the sole member and controlling officer of 635 W. Lakeside Ave., Ltd., transferred 100% of the membership units of 635 W. Lakeside Ave., Ltd., to the trust in September 2006. The court further found that Georgalis was the sole trustee of the trust and owned all interests in the trust. The court explained that from 2006 until late 2015, the trust (i.e., the developer's successor in interest) still owned 11 units, or 55.54% of the property and voting power in the association. Further, until late 2015, Georgalis, his wife, and his nephew had been members of the board of directors despite the fact that Georgalis's wife and nephew had never been unit owners. A bona fide unit owner eventually brought suit against the developer for participating in the governance of the Association under R.C. Chapter 5311. According to R.C. 5311.08(D), a developer must relinquish control five years after the condominium units are declared. The court granted a permanent injunction against the Georgalis, his wife and nephew, the trust, 635 W. Lakeside, Ltd., and any other successor in interest, "from participating, voting, or otherwise influencing owners, the Board of Directors, or amendment to the Declaration regarding control of the association." The Association attached a certified copy of this decision to its summary judgment motion in this case.

{¶ 7} In September 2019, the trial court granted the association's motion in part relating to the "parking lease." It found that "the [d]eclaration does not prohibit an assessment of a portion of the parking lease payment to plaintiff's units without parking."

{¶ 8} Georgalis's remaining claims were tried to the bench in November 2019. The trial court found in the association's favor on Georgalis's remaining claims. Georgalis appealed. It is from the trial court's judgment granting the association partial summary judgment that Georgalis now appeals.

## II. Law and Analysis

{¶ 9} In his sole assignment of error, Georgalis argues that the trial court erred when it granted summary judgment to the association on his breach of contract claim relating to the parking lease. Georgalis contends that since May 2015, the association "has improperly assessed the [t]rust's basement and first floor units for their purported share of the parking lease expense, even though those units have never had parking spaces." He argues that there are genuine issues of material fact remaining with respect to (1) whether the parking lease permits the assessments at issue, (2) whether the parking lease should be construed against Georgalis as its drafter, and (3) whether the garage spaces are limited common elements.

{¶ 10} We review a trial court's decision on summary judgment under a de novo standard of review. *Baiko v. Mays*, 140 Ohio App.3d 1, 10, 746 N.E.2d 618 (8th Dist.2000). Accordingly, we afford no deference to the trial court's decision and independently review the record to determine whether summary judgment is

appropriate. *Northeast Ohio Apt. Assn. v. Cuyahoga Cty. Bd. of Commrs.*, 121 Ohio App.3d 188, 192, 699 N.E.2d 534 (8th Dist.1997).

{¶ 11} Civ.R. 56(C) provides that before summary judgment may be granted, a court must determine that (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the nonmoving party. *State ex rel. Duganitz v. Ohio Adult Parole Auth.*, 77 Ohio St.3d 190, 191, 672 N.E.2d 654 (1996).

{¶ 12} The moving party carries an initial burden of setting forth specific facts that demonstrate his or her entitlement to summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). If the movant fails to meet this burden, summary judgment is not appropriate, but if the movant does meet this burden, summary judgment will be appropriate only if the nonmovant fails to establish the existence of a genuine issue of material fact. *Id.* at 293.

{¶ 13} Condominium declarations and bylaws are contracts between the association and the purchaser and are subject to the traditional rules of contract interpretation. *Nottingdale Homeowners' Assn., Inc. v. Darby*, 33 Ohio St.3d 32, 35-36, 514 N.E.2d 702 (1987). A contract that is clear and unambiguous requires no real interpretation or construction and will be given the effect called for by the plain language of the contract. *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 55, 544 N.E.2d 920 (1989).

**{¶ 14}** Where a contract's terms are clear and unambiguous, its interpretation is as a matter of law, not fact, and may be adjudicated by summary judgment. *Dutch Maid Logistics, Inc. v. Acuity*, 8th Dist. Cuyahoga Nos. 91932 and 92002, 2009-Ohio-1783, ¶ 19. We, therefore, interpret the terms of the association's declaration and bylaws de novo. *Continental W. Condo. Unit Owners Assn. v. Howard E. Ferguson, Inc.*, 74 Ohio St.3d 501, 502, 660 N.E.2d 431 (1996).

**{¶ 15}** Georgalis first argues that "[g]enuine issues of material fact remain as to whether the parking lease permits the assessments at issue." He maintains that the terms of the declaration are not clear in this regard. The association contends that the declaration unambiguously provides that all unit owners equally pay the monthly parking garage rent whether they have a parking space or not.

**{¶ 16}** On November 2, 2006, a lease agreement was executed between the association (identified as the "tenant") and 701 Lakeside LLC (identified as the "landlord"). Georgalis executed the lease agreement as the "president" of the association (which he was at that time) and as "member" of 701 Lakeside LLC. The lease agreement was attached to the declaration as Exhibit 7.

**{¶ 17}** According to the section 1.03 of the lease agreement:

Leased Premises. Thirty-Eight (38) parking spaces located on the second floor level of the Worthington Garage (the "Building"), located at 701 Lakeside Avenue, Cleveland, Ohio 44113 (the "Leased Premises"). The land underlying the building of which the Leased Premises are a part and the building and improvements constructed thereon are hereinafter referred to collectively as the "Property." Tenant hereunder is the tenant of the parking spaces in the capacity of agent for each of the condominium unit owners of The Cloak Factory Condominium, and Tenant shall not have the right of possession of any

of such parking spaces; all such possessory rights shall belong to each condominium unit owner according to the assignment of such parking spaces made at the time of closing and transfer of title of a condominium unit to a unit owner.  Tenant shall not have the right to reassign or change parking space designations granted to each unit owner, but Tenant shall add to its budget and collect as part of the monthly assessment an amount sufficient to pay each monthly installment of rent as it comes due during the Original Term, together with amounts sufficient to pay the other costs, charges and expenses payable by Tenant hereunder.

{¶ 18} Pursuant to Article XVIII(U) of the declaration:

Parking.  Each Unit Owner, at the initial purchase of his or her Unit from Declarant, shall be assigned one or more parking spaces on the second floor of the parking structure located at 701 W. Lakeside Avenue immediately adjoining The Cloak Factory Condominium. Thereafter, each Unit Owner, and his or her successor in interest, shall continue to have the right to park in such space(s) pursuant to and under the terms of that certain Lease Agreement by and between 701 Lakeside, LLC as Landlord and The Cloak Factory Condominium Unit Owners' Association as Tenant, a copy of which Lease Agreement is attached hereto as Exhibit 7.  Under the terms of the Lease Agreement, the Unit Owners' Association has no right to possession or control of the parking spaces, but rather acts in the capacity of agent only for each Unit Owner.  Only the Unit Owner assigned to a space or spaces has the right of possession and control of the parking space(s) assigned to a Unit Owner.  *Notwithstanding the foregoing, the Unit Owners' Association shall and does hereby have the obligation to pay the rent and other charges and perform all other obligations of the Tenant under the Lease Agreement, which charges and other obligations the Unit Owners' Association shall include in its budget for payment by the Unit Owners as part of the monthly assessment and charges due from each Unit Owner to the Unit Owners' Association.*

(Emphasis added.)

{¶ 19} Georgalis claims that although Article XVIII(U) of the declaration states that the association shall include the parking garage rent in its budget as part of the monthly assessment and charges due from each unit owner, it "assumes that [the association] has complied with the Declaration in assigning each unit owner at

least one parking space." Georgalis asserts that "[t]he lack of parking spaces assigned to the trust's basement and first floor units reflects a clear deviation from the dictates of the Declaration." Georgalis maintains that "despite the [association's] removal of the benefit to which the relevant portion of the monthly assessment relates, it nevertheless continues to charge the Trust for its pro rata share of the rent due under the Parking Lease."

{¶ 20} However, Georgalis is the one who made the decision to not assign parking spaces to the basement and first floor units. Georgalis explained in his affidavit attached to his motion for summary judgment, "As the Trust did not purchase any units from Declarant/the Developer and is instead the successor-in-interest to the unsold units of the Developer, and in recognition of the limited parking spaces, the Trust agreed that the basement unit and first floor units would not have assigned any parking spaces." Therefore, Georgalis cannot now claim that the Association removed the parking benefit.

{¶ 21} We agree with the association that Article XVIII(U) unambiguously states that notwithstanding the fact that upon initial purchase each unit owner will be assigned a parking space, the association shall include the parking garage rent in its budget and assess all unit owners the cost of the rent.

{¶ 22} The lease agreement establishes that the parking garage rent is an expense that the association must include in its budget and assess each unit owner according to the owner's percentage of ownership in the common elements, and

Article XVIII(U) of the declaration sets forth the provision stating that the association shall do just that.

{¶ 23} Georgalis further argues that he "has repeatedly requested the [association] to revise 'Exhibit 4' attached" to the declaration to remove the trust's basement square footage and first floor units from the total square footage "to reflect the lack of parking spaces for which the Trust has been duly assessed." But Article II(B) of the declaration states in relevant part that "[t]he extent of such ownership in the Common Elements is hereby deemed and expressed by the percentage amount hereinafter set forth in Exhibit 4; such percentage amount shall remain constant and shall not be changed except by an amendment to this Declaration unanimously approved by all Unit Owners affected." Exhibit 4 is attached to the declaration and bylaws, and has each unit's square footage and percentage of ownership.

{¶ 24} Georgalis next argues that genuine issues of material fact remain as to whether the parking lease should be construed against him as its drafter. Specifically, Georgalis maintains that just because he executed the parking lease on behalf of the landlord does not mean that the lease must be construed against him as the drafter. This rule, however, only applies when a contract is ambiguous, and we find no ambiguity here. *Bond v. Halcon Energy Props.*, 7th Dist. Mahoning No. 15MA0178, 2017-Ohio-7754, ¶ 24.

{¶ 25} Finally, Georgalis contends that genuine issues of material fact remain as to whether the garage spaces are limited common elements. He argues

that "[a]s the Declaration conclusively categorizes the parking spaces as limited common elements, only those unit owners to whom the exclusive and irrevocable license of use attaches should be responsible for the cost associated with same."

{¶ 26} Article I of the declaration sets forth definitions used in the declaration. Article I(F) of the declaration defines "Common Elements" to include the following parts of the condominium property:

(1) The Real Estate described in the Declaration.

(2) All other areas, facilities, places and structures that are not part of a Unit or are not delineated as part of a Unit in the Drawings as well as the Limited Common Elements hereinafter defined, including but not limited to:

(i) The corridors and lobbies of the Building;

(ii) The open space on the roof of the Building identified in the Drawings;

(iii) Easements created for the benefit of the Condominium Property;

(iv) In general, all apparatus and installations existing for common use;

(v) Such community facilities as may be provided for in the Declaration; and

(vi) All other parts of the Condominium Property necessary or convenient to its existence, maintenance and safety, or normally in common use, or that have been designated as Common Elements in the Declaration or Drawings.

{¶ 27} Article I(S) of the Declaration defines "Limited Common Elements" as "the Common Elements designated in the Declaration as reserved for a certain Unit or Units to the exclusion of other Units."

{¶ 28} Article II sets forth "Establishment of Condominium Ownership and Division of Condominium Property." Article II(B), titled "Common Elements," provides:

(1) Description of Common Elements. The entire balance described in the attached legal description of the Real Estate and improvements thereon, including but not limited to, community facilities, if any, pumps, elevators, pavement, wires, conduits, central heating and cooling units, chillers, towers, pipes and compressors, utility lines and ducts now or hereafter situated on the Condominium Property, all as hereinbefore more specifically described in Article 1(F) hereof, are hereby declared and established as the Common Elements. Unless otherwise provided by the Unit Owners' Association, however, the care, maintenance, repair and replacement of all or any portion of such elements qr [sic] fixtures located within a Unit shall be the responsibility of the owner of such Unit.

(2) Limited Common Elements.  Each Unit Owner is hereby granted an exclusive and irrevocable license to use and occupy to the exclusion of all other Unit Owners, the Limited Common Elements which serve only his Unit.  The Limited Common Elements with respect to each Unit shall consist of such of the following as may be constructed to be Common Areas or which are deemed to be appurtenant to such Unit:

* * *

(iv) The leasehold estate of the Unit Owner in the parking space(s) assigned to such Unit Owner at the time of original purchase of his or her Unit, which parking space(s) is or are described in that certain Lease Agreement by and between 701 Lakeside LLC as landlord and The Cloak Factory Condominium Unit Owners' Association as tenant (in its capacity as agent only for each Unit Owner in The Cloak Factory Condominium), a copy of which Lease Agreement is attached hereto as Exhibit 7.

(3) Use of Common Elements.  Each Owner of a Unit shall own an undivided interest in the Common Elements as a tenant in common with all other-such Owners, and, except as otherwise limited in this Declaration and in the Bylaws attached hereto as Exhibit 3, each Owner shall have the right to use the Common Elements for all purposes incident to the use and occupancy of his Unit as a place of residence and such other incidental uses permitted by this Declaration and the

Bylaws, including the non-exclusive easement, together with other Unit Owners, to the use and enjoyment of the Common Elements and for ingress and egress to and from the respective Units, which rights shall be appurtenant to and shall run with his Unit.  The extent of such ownership in the Common Elements is hereby deemed and expressed by the percentage amount hereinafter set forth in Exhibit 4; such percentage amount shall remain constant and shall not be changed except by an amendment to this Declaration unanimously approved by all Unit Owners affected.

(4) Ownership of Common Elements.  Subject to modification as hereinafter described, the percentage of ownership of the Common Elements attributable to the ownership Interest in each Unit, together with the percentage of interest in the Association for the division of Common Expenses, Common Assessments, Common Surplus, Common Profits and Common Losses, as hereinafter described in Article V, Section (B), of this Declaration, shall be in accordance with Exhibit 4 attached hereto and made a part hereof.  The percentage of interest in the Common Elements is in the proportion that the number of square feet contained in the Unit bears to the aggregate number of square feet contained in all Units.  Numbers and reference to this Declaration, any amendments thereto, and to the Drawings shall be sufficient to convey the Unit and the Condominium Ownership Interest in the Common Elements (including the Limited Common Elements) appurtenant thereto.

{¶ 29} Although Article II(B)(2)(iv) states that "the leasehold estate of the Unit Owner in the parking space(s) assigned to such Unit Owner at the time of original purchase of his or her Unit" and is included under "Limited Common Elements" under Article II(B)(2), the "Limited Common Elements" subsection is still under the "Common Elements" section of Article II(B).  Therefore, just as Article I(S) defines "Limited Common Elements" as "the Common Elements designated in the Declaration as reserved for a certain Unit or Units to the exclusion of other Units," Article II(B) likewise includes limited common elements as a subset of

common elements.  And the bylaws make clear that all unit owners equally share the cost of the common elements, which includes limited common elements.

{¶ 30} Article V of the declaration sets forth assessments.  It states in relevant part:

(A) General. Assessments for the management, maintenance, repair and insurance of the Common Elements, Limited Common Elements, rent and other charges due under the terms of the Lease Agreement attached as Exhibit 7, and amounts determined by the Board of Directors of the Association for the establishment and maintenance of the reserve fund to meet the cost and expense of repair and replacement of the Common Elements together with the payment of the Common Expenses, shall be made in the manner provided herein, and in the manner provided in the Bylaws attached hereto as Exhibit 3.

(B) Division of Common Expenses. Common Assessments. Common Surplus. Common Profits and Common Losses. The proportionate shares of the separate Owners of the respective Units in the Common Expenses, Common Assessments, Common Surplus, Common Profits and Common Losses of the operation of the Condominium Property is based upon the undivided interest of such Units expressed in Exhibit 4 hereof.  The acquisition or occupancy of any Unit shall be conclusive evidence against the Owner or Occupant thereof that the percentage set forth opposite each Unit in Exhibit 4 of this Declaration is in the proportion that the undivided interest of the Unit bears to the entirety of interests of all Units on the date this Declaration is filed for record, and the proportionate share of profits and expenses of each Unit Owner shall be in accordance with said percentages set forth in Exhibit 4 hereof. Notwithstanding the foregoing, the Unit Owners' share of Common Expenses related to the Recreational Facilities shall be shared with the residents and occupants of The Pinnacle Condominiums, and determined in accordance with the provisions of the Easement and Use Agreement as described in Article HLG. above.

{¶ 31} According to Article II, Section 10 of the bylaws, the associations' board of directors levies assessments against the unit owners.  Article V, Section 1 of the bylaws states that unit owners shall pay monthly assessments.  Article V, Section 2 of the bylaws states:

Each year on or before December 1st, the Association shall estimate the total amount necessary to pay the cost of wages, materials, insurance, services and supplies which will be required during the ensuing calendar year for the rendering of all services, together with a reasonable amount considered by the Association to be necessary for a reserve for contingencies and replacements, and shall on or before December 15th notify each owner in writing as to the amount of such estimate, with a reasonable itemization thereof. Said "estimated cash requirements" shall be assessed to the owners according to each owner's percentage of ownership in the Common Elements as set forth in the Declaration.

{¶ 32} These provisions make clear that the assessments are based upon each unit owner's proportionate share of ownership set forth in Exhibit 4 attached to the declaration. Although Georgalis argues that the trust's proportionate share in the basement and first floor units *should be* less because they do not have parking spaces, Article V(B) states that the "acquisition or occupancy of any Unit shall be conclusive evidence against the Owner or Occupant thereof that the percentage set forth opposite each Unit in Exhibit 4 of this Declaration" is the owner's proportionate share of ownership as well as the profits and expenses. And Article II(B)(3) explicitly states that the ownership percentage in the common elements, which again includes the limited common elements, "shall remain constant and shall not be changed except by an amendment to this Declaration unanimously approved by all Unit Owners affected."

{¶ 33} We note that Georgalis, albeit through his company and later the trust, is the one who established the declaration and bylaws. He is also the one who decided that the basement and first floor units would not have parking spaces. When he was responsible for paying a majority of the expenses because he owned a

majority of the units (for many years), the fact that all unit owners had to share in parking garage expenses benefited him. But now, when he only owns five units, he no longer wants all unit owners to share in the expenses.

{¶ 34} Although Georgalis maintains that "only those unit owners" who have parking spaces "should be responsible for the costs associated" with the parking garage rent, the changes to the declaration and bylaws that he desires will not be accomplished through the court system. He essentially argues that it is not fair that the trust has to pay its share of the rent for the parking garage. However, the Ohio Supreme Court has made clear that "courts should not rewrite contracts." *N. Buckeye Edn. Council Group Health Benefits Plan v. Lawson*, 103 Ohio St.3d 188, 2004-Ohio-4886, 814 N.E.2d 1210, ¶ 20. As the Supreme Court stated in *Lawson*,

> "Cases of contractual interpretation should not be decided on the basis of what is 'just' or equitable. This concept is applicable even where a party has made a bad bargain, contracted away all his rights, and has been left in the position of doing the work while another may benefit from the work. Where various written documents exist, it is the court's duty to interpret their meaning, and reach a decision by using the usual tools of contractual interpretation (e.g., the written documents, the intent of the parties, and the acts of the parties) and not by a determination of what is fair, equitable, or just."

*Id.* at ¶ 20, quoting *Ervin v. Garner*, 25 Ohio St.2d 231, 239-324, 267 N.E.2d 769 (1971).

{¶ 35} Accordingly, we overrule Georgalis's sole assignment of error.

{¶ 36} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

MARY J. BOYLE, ADMINISTRATIVE JUDGE

ANITA LASTER MAYS, J., and
KATHLEEN ANN KEOUGH, J., CONCUR