[Cite as *Cambridge Health Leasing, L.L.C. v. Embassy Cambridge, L.L.C.*, 2025-Ohio-3278.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

CAMBRIDGE HEALTH LEASING,     :
LLC, ET AL.,

                            :

       Plaintiffs-Appellants/
       Cross-Appellees,        :            No. 114523

       v.                      :

EMBASSY CAMBRIDGE, LLC, ET AL.,   :

       Defendants-Appellees/      :
       Cross-Appellants.

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, REVERSED IN PART,
                AND VACATED IN PART
**RELEASED AND JOURNALIZED:** September 11, 2025

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-21-942503

---

### *Appearances:*

The Coey Law Firm, LLC, and G. Brenda Coey; Stephen D. Dodd Co., LLC, and Stephen D. Dodd, *for appellants/cross-appellees.*

Tucker Ellis LLP, Michael J. Ruttinger, Elisabeth C. Arko, and Razi Lane, *for appellees/cross-appellants.*

EILEEN A. GALLAGHER, A.J.:

{¶ 1} Cambridge Health Leasing, LLC, et al., ("Cambridge") appeals the trial court's granting partial summary judgment against it in this breach of contract case.[1] Additionally, Embassy Cambridge, LLC, et al., ("Embassy"), who entered into the contract at issue with Cambridge, cross-appeals various trial court rulings and the jury verdict.[2] For the following reasons we reverse in part, affirm in part and vacate in part the trial court's judgments.

**Facts and Procedural History**

{¶ 2} On February 28, 2020, Embassy and Cambridge entered into an operations transfer agreement ("OTA") in which Embassy was to assume the operation of six skilled nursing facilities previously leased by Cambridge. The OTA became effective as of March 1, 2020 ("effective date"). The OTA set forth the parties' rights and obligations for the six facilities' assets, liabilities and revenues.

---

[1] Appellants/cross-appellees consist of the following parties: Cambridge Health Leasing, LLC; Franklin Woods Leasing, LLC; Lebanon Healthcare Leasing, LLC; Logan Healthcare Leasing, LLC; Pickerington Leasing, LLC; Winchester Place Leasing, LLC; Eli Gunzburg; Aspenwood Holdings, LLC; Providence Healthcare Management, Inc.; George Ammar, CPA; Eli M. Gunzburg Irrevocable Trust; Eli Gunzburg Irrevocable Trust 2017; and Redwood Holdings LLC.

[2] Appellees/cross-appellants consist of the following parties: Embassy Cambridge, LLC; Embassy Woodview, LLC; Embassy Lebanon, LLC; Embassy Logan, LLC; Embassy Pickerington, LLC; Embassy Winchester, LLC; Embassy Healthcare Holdings, Inc.; Embassy Healthcare Management, Inc.; Cambridge Property Group, LLC; Cambridge TIC, LLC; Franklin Woods Property, LLC; Franklin Woods TIC, LLC; Lebanon Property, LLC; Embassy Cambridge, LLC; Embassy Woodview, LLC; Embassy Lebanon, LLC; Embassy Logan, LLC; Embassy Pickerington, LLC; Embassy Winchester, LLC; Embassy Healthcare Holdings, Inc.; Embassy Healthcare Management, Inc.; Cambridge Property Group, LLC; Cambridge TIC, LLC; Franklin Woods Property, LLC; Franklin Woods TIC, LLC; Lebanon Property, LLC; Logan Holdings LLC; Pickerington Holdings LLC; BL Winchester Holdings LLC; Benjamin Landa; George Repchick; and Aaron Handler.

Among other things, the OTA set forth assets that were to be retained by "Exiting Operator" Cambridge called "Excluded Assets" and assets that were to be transferred to "New Operator" Embassy called "Transferred Assets."

{¶ 3} During the calendar year 2020, the Ohio Bureau of Workers' Compensation ("BWC") distributed three policy holder dividends ("BWC Distributions") from the State Insurance Fund to the six nursing homes in the amount of $1,854,388.99.[3] All three BWC Distributions were paid after the effective date. Embassy received the monies and alleged the checks were made payable to them as they were the active policy holder at the time the distributions were made.

{¶ 4} The crux of Cambridge's appeal centers around whether the terms of the OTA dictate that Cambridge is to retain ownership of the BWC Distributions after the effective date or if the sums properly belonged to Embassy.

{¶ 5} Because of this dispute, on January 4, 2021, Cambridge filed a complaint against Embassy alleging claims for declaratory judgment; breach of contract; conversion; fraudulent representation; negligent misrepresentation; fraudulent transfer under R.C. 1336.04; tortious interference by Benjamin Landa ("Landa"), George Repchick ("Repchick") and Aaron Handler ("Handler"); civil conspiracy by Landa, Repchick and Handler; unjust enrichment and constructive trust.

---

[3] In the parties' briefs, the dividends are referred to as dividends/distributions/refunds/rebates but they all refer to the same monies provided by the BWC based on premiums paid in the 2018 and 2019 calendar years. Here they will be referred to as the "BWC Distributions."

{¶ 6} On June 9, 2021, Embassy filed an answer, a counterclaim against Cambridge for breach of contract, a third-party complaint against the BWC and Eli M. Gunzburg ("Gunzburg") and another third-party complaint against Gunzburg and Aspenwood Holdings, LLC. On August 26, 2022, Embassy filed an amended answer, counterclaim and third-party complaint.

{¶ 7} On December 14, 2022, Embassy filed a motion for partial summary judgment regarding its claims for the BWC Distributions, declaratory judgment and breach of contract, as well as for unjust enrichment and constructive trust. On January 30, 2023, Cambridge filed a brief in opposition to Embassy's motion for summary judgment and filed its own motion for partial summary judgment on its breach of contract, unjust enrichment and constructive trust claims.

{¶ 8} On June 20, 2023, Embassy filed another motion for partial summary judgment that was titled "[Embassy's] third partial motion for summary judgment" where it alleged Cambridge violated the OTA by failing to pay civil money penalties issued by Centers for Medicare and Medicaid Services in the amount of $95,300. On July 20, 2023, Cambridge filed its brief in opposition and motioned the court for partial summary judgment for this breach of the OTA regarding the civil money penalties.

{¶ 9} On August 20, 2023, Cambridge filed a motion for partial summary judgment regarding provider relief funds Cambridge received pursuant to the Coronavirus Aid, Relief, and Economic Security ("CARES") Act in the amount of

$2,930,327. On August 21, 2023, Embassy filed a third motion for partial summary judgment regarding the CARES Act alleging it was entitled to the funds.[4]

{¶ 10} On August 22, 2023, Cambridge filed another motion for partial summary judgment regarding additional BWC funds received by Embassy, ownership of revenues for care and services provided before the effective date that were received by Embassy, ownership of cost report-related funds and the retention of copiers and a vehicle. Cambridge alleged Embassy unlawfully retained these funds and property in violation of the OTA entitling Cambridge to damages for conversion. No brief in opposition was filed by Embassy and the trial court found this motion was unopposed. On August 24, 2023, Embassy did, however, file a motion to strike Cambridge's August 22, 2023 motion alleging Cambridge had already filed a motion for partial summary judgment regarding BWC Distributions. The trial court denied Embassy's motion to strike on November 28, 2024.

{¶ 11} On July 9, 2024, the trial court entered judgment and then modified said judgment on July 18, 2024, via a nunc pro tunc entry. The trial court granted Embassy's motion for partial summary judgment filed on December 14, 2022 and denied Cambridge's motion for partial summary judgment filed on January 30, 2023. In this regard the trial court found that

> [i]n construing all the evidence in a light most favorable to the nonmoving party, the court finds that reasonable minds could only reach the conclusion that the BWC COVID dividends are not

---

[4] Embassy titled this motion "[Embassy's] Fourth Motion for Partial Summary Judgment" despite it being its third motion.

> transferred assets under the terms of the OTA and Cambridge plaintiffs are not entitled to payment of those funds from embassy defendants.

Despite finding the BWC Distributions were "not transferred assets," which thereby made them Excluded Assets, the trial court held Cambridge was not entitled to those funds from Embassy.

{¶ 12} The trial court denied Embassy's motion for partial summary judgment filed on June 20, 2023 and granted Cambridge's motion for partial summary judgment filed on July 20, 2023. The court found that Cambridge was entitled to judgment as a matter of law as to Embassy's claims for Cambridge's failure to reimburse Embassy for civil money penalties issued by Centers for Medicare and Medicaid Services in the amount of $95,300.

{¶ 13} The trial court also granted Cambridge's August 20, 2023 motion for partial summary judgment and denied Embassy's August 21, 2023 motion for partial summary judgment. The trial court found that the OTA did not entitle Embassy to CARES Act provider relief funds as the funds did not meet the definition of Transferred Assets under the OTA. The trial court found that Cambridge was entitled to judgment as a matter of law regarding Embassy's counterclaim and third-party claims asserted that were premised upon entitlement to the CARES Act funds.

{¶ 14} The trial court found Cambridge's August 22, 2023 motion for partial summary judgment was unopposed and granted the motion. In doing so, construing the evidence in a light most favorable to the nonmoving party, the trial court found:

> (1) that the BWC rebates and refunds (separate from the three COVID dividends discussed above) in the amount of $120,486.31 are

transferred assets under the OTA that were explicitly excluded from assets to be retained by new operator/embassy defendants. Accordingly, judgment is granted in favor of Cambridge plaintiffs with respect to BWC "non-COVID dividend" refunds in the total amount of $120,486.31, subject to 8% statutory interest from the date of this judgment.

(2) the court finds that Cambridge plaintiffs are entitled to partial summary judgment with respect to the resident care funds in the total amount of $2,688,521.87, subject to 8% statutory interest from the date of this judgment.

(3) the court finds that Cambridge plaintiffs are entitled to partial summary judgment with respect to the cost report claims in the total amount of $166,260.94, subject to 8% statutory interest from the date of this judgment.

(4) the court finds that Cambridge plaintiffs are entitled to partial summary judgment with respect to the bad debt claims in the total amount of $119,336.94, subject to 8% statutory interest from the date of this judgment

. . .

(5) the court finds that embassy parties has been unjustly enriched by using copiers and vehicles left by Cambridge plaintiffs while Cambridge plaintiffs made lease payments related to these items while in the use and possession of embassy parties. Accordingly, summary judgment is granted in favor of Cambridge plaintiffs related to embassy parties use of copiers and vehicles in the amount of $78,650.38, subject to 8% statutory interest from the date of this judgment.

(6) the court finds that Cambridge plaintiffs have met the elements of a conversion claim related to the foregoing assets, having made timely demand. A hearing on plaintiffs request for attorney's fees and punitive damages related to conversion claim to be held at a later date.

{¶ 15} On July 11, 2024, pursuant to Civ.R. 41(A), Cambridge voluntarily dismissed its claims "for fraudulent representation, negligent misrepresentation, fraudulent transfer, tortious business interference, and constructive trust, only." On July 12, 2024 the trial court dismissed without prejudice Cambridge's claims and

found the sole remaining claim for trial was for civil conspiracy. Also on July 12, 2024, Embassy filed a motion for reconsideration of this July 12, 2024 order, alleging Cambridge could not partially dismiss its claims pursuant to Civ.R. 41(A). On July 18, 2024 the trial court granted Embassy's motion and vacated the dismissal. The trial court went on to state that it was construing the voluntary notice as an abandonment by Cambridge of their claims for fraudulent representation, negligent misrepresentation, fraudulent transfer, tortious business interference and constructive trust, which Cambridge did not oppose.

{¶ 16} On July 22, 2024, a jury trial began regarding the parties' remaining claim to be tried. The trial court found in its July 29, 2024 journal entry that Cambridge's first, second, third and ninth causes of action were disposed by the court via its summary judgment rulings and that cause of actions four, five, six, seven and ten were abandoned by Cambridge. The sole issue in front of the jury was Cambridge's eighth cause of action for civil conspiracy by Landa, Repchick and Handler.

{¶ 17} On July 29, 2024, the jury returned a verdict in favor of Cambridge and against Repchick and Handler in regards to the civil conspiracy awarding $505,000 in compensatory damages. The jury returned a general verdict for Landa.

{¶ 18} The court ordered the parties to file dispositive motions regarding Embassy's remaining counterclaims/third-party claims.

{¶ 19} On September 6, 2024, the trial court issued a judgment with an opinion and final order granting Cambridge's motion for partial summary judgment as to all of Embassy's remaining counterclaims and third-party claims.

{¶ 20} The court then held a hearing on Cambridge's claim for punitive damages and attorney's fees on September 18, 2024. On October 31, 2024, the trial court issued a journal entry with an opinion and order finding Cambridge established by clear and convincing evidence entitlement to an award of punitive damages and reasonable attorney's fees against Embassy. This award was in regard to Embassy's conversion "of resident care funds, cost report monies, workers' compensation refunds, bad debt monies, vehicles and copiers." The court awarded Cambridge $7,500 in punitive damages and $354,740.80 in reasonable attorney's fees.

{¶ 21} On November 1, 2024, Cambridge filed its notice of appeal regarding the trial court's July 18, 2024 journal entry raising one assignment of error:

> **Assignment of Error:** The trial court erred in failing to grant [Cambridge's] motion for summary judgment per the clear and unambiguous language of the operations transfer agreement.

{¶ 22} On November 27, 2024, Embassy filed its notice of cross-appeal concerning the trial court's October 31, 2024 journal entry denying its various motions and the trial court's award of punitive damages and attorney's fees; the trial court's September 5, 2024 order denying Embassy's motion for reconsideration; the trial court's September 6, 2024 order granting Cambridge's motion for partial summary judgment as to Embassy's cross-claims; the July 9, 2024 order granting

Cambridge's motion for partial summary judgment; the July 18, 2024 nunc pro tunc order granting Cambridge's motion for partial summary judgment; the July 29, 2024, entry journalizing the jury's verdict on Cambridge's civil conspiracy claims; and the September 9, 2021 order dismissing all claims against the BWC for lack of subject matter jurisdiction.

{¶ 23} Embassy raises the following cross-assignments of error:

**Cross-Assignment of Error No. 1:** The trial court erred when it granted the Cambridge Entities' motion for partial summary judgment as to the Embassy Entities' counterclaims and third-party claims, which pertained to CARES Act Provider Relief Funds.

**Cross-Assignment of Error No. 2:** The trial court erred when it granted as "unopposed" the Cambridge Entities' motion for partial summary judgment regarding assets delineated in the OTA.

**Cross-Assignment of Error No. 3:** The trial court erred in denying the Motion for JNOV filed by Individual Defendants Handler and Repchick. 10/31/24 Order, R. 481.

**Cross-Assignment of Error No. 4:** The trial court erred in denying Handler's and Repchick' s motion for new trial.

**Cross-Assignment of Error No. 5:** The trial court erred in awarding punitive damages at summary judgment and after a hearing where the Embassy Entities had no notice that punitive damages would be heard.

**Cross-Assignment of Error No. 6:** The trial court erred and abused its discretion in awarding the Cambridge Entities $354,740.80 in attorney fees.

**Cambridge's Assignment of Error**

{¶ 24} Cambridge alleges the trial court erred in denying its motion for partial summary judgment concerning the BWC Distributions. Cambridge alleges

the OTA is clear and unambiguous and under its terms Cambridge is entitled to the funds. Upon review of the record and the OTA, we agree.

**BWC Distributions**

{¶ 25} It is undisputed that the BWC issued three distributions to Embassy in 2020. It is undisputed that these payments were calculated based on the premiums paid by Cambridge as an employer in 2018 and 2019 to the BWC to provide medical insurance and other benefits to Cambridge's employees in the event of a work-related injury. These payments will be referred to as the "April 2018 Distribution," the "October 2019 Distribution" and the "December 2019 Distribution." The following facts are undisputed regarding the Distributions: the April 2018 Distribution was calculated based on 100 percent of the paid premiums for the 2018 BWC policy year, less any installments due or late fees. Based on Cambridge's premium payments, the total amount of the April 2018 Distribution was $357,517.59. The October 2019 Distribution was also based on 100 percent of the premiums paid by Cambridge for 2019, less any installments due or late fees, which amounted to $316,825. Last, the December 2019 Distribution was calculated based on 372.46 percent of the annual premiums paid for 2019, less any installments due or late fees, which amounted to $1,180,046.40. The total amount of the BWC Distributions, which Cambridge alleged Embassy has unlawfully retained in breach of the OTA, is $1,854,388.99.

**Standard of Review: Summary Judgment Law and De Novo**

{¶ 26} We review the trial court's ruling on a summary judgment motion de novo, applying the same standard as the trial court under Civ.R. 56(C). *Wells Fargo Bank, N.A. v. Lundeen*, 2020-Ohio-28, ¶ 10 (8th Dist.), citing *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). We accord no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate. *Lundeen* at ¶ 10, citing *Ruf v. Belfance*, 2013-Ohio-160, ¶ 8 (9th Dist.).

{¶ 27} The party moving for summary judgment bears the burden of demonstrating that no material issues of fact exist for trial. *Hollins v. Shaffer*, 2009-Ohio-2136, ¶ 14 (8th Dist.); *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293 (1996). Summary judgment is appropriate when there is no genuine issue of material fact, the moving party is entitled to judgment as a matter of law, and reasonable minds can only reach a conclusion that is adverse the nonmoving party. *Dresher* at 288-89. The moving party has the initial responsibility of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements of the nonmoving party's claims. *Deutsche Bank Natl. Trust Co. v. Talliere*, 2023-Ohio-75, ¶ 11 (8th Dist.), citing *Dresher*. The only evidence to be considered in deciding summary judgment is that which is found in the "pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action." Civ.R. 56(C).

**{¶ 28}** "After the moving party has satisfied this initial burden, the nonmoving party has a reciprocal duty to set forth specific facts by the means listed in Civ.R. 56(C) showing that there is a genuine issue of material fact for trial." *Talliere* at ¶ 11.

**Contract Interpretation**

**{¶ 29}** Where a contract's terms are clear and unambiguous, its interpretation is a question of law that is reviewed de novo on appeal. *Georgalis v. Cloak Factory Condominium Unit Owners' Assn.*, 2021-Ohio-66, ¶ 14 (8th Dist.). When a contract is clear and unambiguous, it requires no real interpretation or construction and will be given the effect called for by the plain language of the contract. *Georgalis* at ¶ 13, citing *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 55 (1989).

**{¶ 30}** If a contract's language is plain and unambiguous, the terms are enforced as written and courts may not turn to extrinsic evidence outside the four corners of the contract to alter its meaning. *Patel v. Strategic Group, L.L.C.*, 2020-Ohio-4990, ¶ 35 (8th Dist.), citing *Beverage Holdings, L.L.C. v. 5701 Lombardo, L.L.C.*, 2019-Ohio-4716, ¶ 13. "A contract is ambiguous if its terms cannot be clearly determined from a reading of the entire contract or if its terms are susceptible to more than one reasonable interpretation." *Militiev v. McGee*, 2010-Ohio-6481, ¶ 30 (8th Dist.), citing *United States Fidelity & Guar. Co. v. St. Elizabeth Med. Ctr.*, 129 Ohio App.3d 45, 55, (2d Dist. 1998).

{¶ 31} "[T]he fact that parties may adopt conflicting interpretations of a contract between them, while involved in litigation, will not create ambiguity or a basis for unreasonable interpretation of the language and original intent of the parties where no such ambiguity should reasonably be found." *Ohio Water Dev. Auth. v. W. Res. Water Dist.*, 2002-Ohio-4393 ¶ 25 (10th Dist.).

{¶ 32} For a breach of contract claim, a party must show "'(1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant and (4) resulting damages to the plaintiff.'" *Capital One Bank (U.S.A.), N.A. v. McCladdie*, 2022-Ohio-4082, ¶ 21 (8th Dist.), quoting *Garfield Estates, L.L.C. v. Whittington*, 2021-Ohio-211, ¶ 20 (8th Dist.).

**Relevant Sections of the OTA**

{¶ 33} It is undisputed that the OTA is a binding contract between the parties. Cambridge alleges that Embassy breached said contract by failing to provide the three BWC Distributions to Cambridge per the terms of the OTA, which caused damage to Cambridge. Specifically, Cambridge alleges there are three main sections of the OTA that govern the BWC Distributions. First is Section 1(B).

**Section 1 – Defined Transferred and Excluded Assets**

{¶ 34} Section 1(A) of the OTA sets forth five categories of assets ("Transferred Asset(s)") that would be transferred on the effective date from the "Exiting Operator," Cambridge, to the "New Operator," Embassy. Transferred Assets in Section 1(A) consist of things such as assumed contracts, facility records, inventory, computers and licenses.

{¶ 35} Pursuant to Section 1(B) any asset not identified as a Transferred Asset in Section 1(A) remained the property of Cambridge:

> Except as expressly set forth in Section 1(A), *no other assets of Exiting Operator shall be transferred to the New Operator,* and no other assets of the Exiting Operator shall be included as "Transferred Assets" for the purposes of this Agreement. Without limiting the generality of the foregoing, and notwithstanding anything to the contrary contained in this Agreement, *the assets of the Exiting Operator listed on Exhibit "A" (collectively, the "Excluded Assets") shall not be transferred to New Operator and shall not constitute Transferred Assets (collectively, the "Excluded Assets").*

(Emphasis added). Based on this, Cambridge claims that the BWC Distributions were not Transferred Assets.

### Exhibit A – Excluded Assets

{¶ 36} Section 1(B) also states that any assets listed on Exhibit A of the OTA shall not be transferred and are collectively called "Excluded Assets." Exhibit A lists 13 bullet points of Excluded Assets and bullet point four states:

> *All refunds or reimbursements of whatever nature or description which relate to or are attributable to the period prior to the Effective Date* and all deposits, escrowed funds and similar funds, *including any retroactive workers' compensation insurance program refunds, rebates, or payments*, whether or not the same are paid prior to or after the Effective Date, if and to the extent they relate to any period prior to the Effective Date.

(Emphasis added). Based on this, Cambridge alleges the BWC Distributions, which Cambridge argued are refunds and/or reimbursements relating and attributable to the period prior to the effective date, are retroactive workers' compensation insurance program refunds/rebates/payments and they should properly be found

to be Excluded Assets and therefore belong to Cambridge. Cambridge alleges that in Exhibit A, the BWC Distributions are specifically identified as Excluded Assets.

### Section 2(C)

{¶ 37} Cambridge further alleges Section 2(C) of the OTA applies to these BWC Distributions:

> Except as expressly provided in this Agreement, revenues and expenses for the billing period(s) in which the Effective Date occurs, including, but not limited to, prepaid expenses and other related items of revenue or expense attributable to the Facility shall be prorated between Exiting Operator and New Operator as of the Effective Date, *with all revenues and expenses accruing, or attributable to the period prior to the Effective Date being for the account of Exiting Operator*, and all revenues and expenses accruing, or attributable to the period on and after the Effective Date being for the account of New Operator.
>
> . . .
>
> Notwithstanding the foregoing, *New Operator acknowledges and agrees that it shall have no right, title or interest in and to any retroactive workers' compensation insurance program refunds, rebates, or payments*, whether or not the same are paid prior to or after the Effective Date, if and *to the extent they relate to any period prior to the Effective Date.*

(Emphasis added). Cambridge argues that pursuant to Section 2(C), because the BWC Distributions were calculated based on premiums paid prior to the effective date, the dividends relate to periods prior to the effective date. As such, Cambridge argues pursuant to Section 2(C) that Embassy has no "right, title or interest" to claim the BWC Distributions regardless if they are paid before or after the effective date.

{¶ 38} Embassy argues that under the plain language of the OTA it is entitled to the BWC Distributions because they were prospective payments, rather than

retroactive payments, and they do not relate to any period prior to the effective date. We disagree.

{¶ 39} Upon review of the OTA, we agree with Cambridge's interpretation. The language of the OTA is clear and unambiguous and, consequently, this court is unable to consider any of the extrinsic evidence Embassy puts forth regarding the BWC's intentions.

{¶ 40} The OTA clearly and unambiguously identified the BWC Distributions as Excluded Assets. Thus, the Distributions were the lawful property of Cambridge. Furthermore, we agree that the BWC Distributions relate to, and are attributable to, periods prior to the effective date. All three BWC Distributions were calculated based on premium payments made by Cambridge in 2018 and 2019, prior to the effective date and thereby relate and are attributable to Cambridge's period of operation.

{¶ 41} Embassy fails to set forth any genuine issues of material fact to dispute the clear and unambiguous language of the OTA. Based on the interpretation of the OTA, reasonable minds can only come to one conclusion that the BWC Distributions are Excluded Assets that properly belonging to Cambridge.

{¶ 42} Therefore, we find that Cambridge is entitled to the BWC Distributions under the terms of the OTA and has been damaged by Embassy's unlawful retention of the funds. Wherefore, we sustain Cambridge's assignment of error and remand this case to the trial court to enter summary judgment in

Cambridge's favor for its claims regarding the BWC Distributions in the amount of $1,854,388.99.

{¶ 43} Next, we turn to Embassy's cross-assignments of error.

**Embassy First Cross-Assignment of Error – CARES Act Provider Relief Funds**

{¶ 44} It is undisputed that at the end of March 2020, Congress passed the Corona Aid, Relief and Economic Security ("CARES") Act, which authorized relief payments ("CARES funds") to businesses. Pursuant to this statute, Cambridge received three distributions totaling $2,930,327.28 in CARES funds. The three distributions took place on April 10, April 24 and May 22, 2020.

{¶ 45} Embassy alleges on appeal that the trial court improperly denied its motion for partial summary judgment regarding its counterclaims concerning the CARES Act provider relief funds paid to Cambridge. Specifically, on appeal, Embassy alleges that pursuant to Section 2(C) of the OTA, the CARES funds are "revenues" and properly belong to Embassy because they relate to a time period after the OTA's effective date.

{¶ 46} Cambridge alleges that Embassy does not have a legal interest in these funds and that under the OTA the funds qualify as "reimbursements" not "revenue" and are, therefore, not Transferred Assets under the OTA.

{¶ 47} We note at the onset that under the OTA Section 1(A) "Transferred Assets," lists all the assets Cambridge intended to transfer to Embassy and that these CARES funds are not listed there and thereby do not qualify as a Transferred Asset.

Section 1(B) of the OTA explicitly states, "Except as expressly set forth in Section 1(A), no other assets of Exiting Operator shall be transferred to the New Operator and no other assets of the Exiting Operator shall be included as 'Transferred Assets' for the purposes of this Agreement."

{¶ 48} Embassy alleges instead that they are entitled to the CARES funds under Section 2(C) of the OTA because they are "revenues" and the OTA states relevantly that any "revenues and expenses" received by either set of parties after the effective date would be "prorated . . . as of the Effective Date, . . . with all revenues and expenses accruing, or attributable, to the period on and after the Effective Date being for the account of New Operator."

{¶ 49} Because we find the contract to be clear and unambiguous, we must look only to the four corners of the contract and the plain and ordinary meaning of the words used. *Scott v. Ford*, 2021-Ohio-208, ¶ 22 (8th Dist.). Undefined terms are "given their plain and ordinary meaning." *Skerlec v. Ganley Chevrolet, Inc.*, 2012-Ohio-5748, ¶ 15 (8th Dist.), citing *Penn Traffic Co. v. AIU Ins. Co.*, 2003-Ohio-3373, ¶ 9.

{¶ 50} Embassy relies on *Black's Law Dictionary* (12th Ed. 2024) for the definition of "revenue," which means "gross income or gross receipts." Embassy argues that the CARES funds qualify as "revenue" under Section 2(C) of the OTA.

{¶ 51} Upon review, we find that the CARES funds do not qualify as "revenue" as the disbursement of the funds had nothing to do with Cambridge's or Embassy's gross income or their gross receipts. These funds were monies given to Cambridge

by the government to spend on COVID related expenses. They were not earned monies related to its operation of nursing homes. We find that neither definition of "revenue" applies to the CARES funds.

{¶ 52} As such, because we find the CARES funds are not "revenue" under the OTA, whether they relate to a period after the Effective Date or not is irrelevant. Section 2(C) of the OTA does not govern the CARES funds.

{¶ 53} Embassy fails to point to any genuine issues of material fact and reasonable minds, then, can only come to one conclusion, which is that under the terms of the OTA, Embassy is not entitled to the CARES funds as a matter of law.

{¶ 54} As such, we find the trial court properly granted Cambridge's motion for partial summary judgment regarding Embassy's counterclaims/third-party claims that concerned the CARES funds.

{¶ 55} Embassy's first cross-assignment of error is hereby overruled.

**Embassy's Second Cross-Assignment of Error**

{¶ 56} For its second cross-assignment of error, Embassy alleges the trial court erred when it granted as "unopposed" Cambridge's August 22, 2023 motion for partial summary judgment.

{¶ 57} Cambridge filed the motion for partial summary judgment as to its breach of contract claim for BWC funds that were not included in the BWC Distributions, resident care monies for services rendered by Cambridge, Cost Report Refunds and Bad Debt Claims, as well as its claims for declaratory relief regarding

the above monies, injunctive relief regarding these funds, unjust enrichment of vehicles and copiers and conversion of all the above funds, vehicles and copiers.

{¶ 58} Embassy alleges that it filed a brief in opposition to this motion for partial summary judgment on September 18, 2023, but as noted by the trial court, this brief in opposition did not address any of the arguments made in Cambridge's motion as detailed above and, instead, focused only on the CARES funds and the BWC Distributions. This brief in opposition specifically states that it is in response to Cambridge's August 20, 2023 motion for partial summary judgment, which concerned the CARES funds. As such, we find that Cambridge's August 22, 2023 motion for partial summary judgment is unopposed.

{¶ 59} "It is a fundamental tenet that a party who does not respond to an adverse party's motion for summary judgment may not raise issues on appeal that should have been raised in response to the motion for summary judgment." *Abram v. Greater Cleveland Regional Transit Auth.*, 2002-Ohio-2622, ¶ 53 (8th Dist.), citing *Thompson v. Ghee*, 139 Ohio App.3d 195, 199 (10th Dist., 2000). *See also B&T Business Ventures v. Disi Bros. Land, LLC*, 2022-Ohio-2113, ¶ 26 ("Failure to raise an argument in response to a summary-judgment motion waives that argument for purposes of appellate review."), citing *U.S. Specialty Ins. Co. v. Hoffman*, 2020-Ohio-4114, ¶ 20 (10th Dist.); *Shutway v. Chesapeake Exploration, LLC*, 2019-Ohio-1233, ¶ 57 (7th Dist.), quoting *Whitson v. One Stop Rental Tool & Party*, 2017-Ohio-418, ¶ 18 (12th Dist.) ("'Appellate courts review summary

judgment decisions de novo but the parties are not given a second chance to raise arguments that they should have raised below.'")

{¶ 60} Because Embassy failed to respond to Cambridge's motion for summary judgment, it may not raise issues on appeal, such as factual disputes that should have been raised in response to the motion. *Abram* at ¶ 53. Embassy has waived these arguments for the purposes of appellate review. *Id.* As such, on appeal Embassy's only reviewable argument is whether Cambridge failed to meet its initial burden demonstrating it is entitled to summary judgment as a matter of law to its above-described claims.

**Claims related to a Breach of the OTA**

{¶ 61} First, we will review the claims related to the breach of the OTA.

**BWC Rebate, Refunds, or Payments**

{¶ 62} Cambridge moved for summary judgment for breach of the OTA regarding BWC rebates, refunds or payments (distinct from the BWC Dividends discussed above) that were received by Embassy in May, September and October 2020 from the BWC, which Embassy failed to remit. Cambridge alleged these payments were related to policy years 2016-2019.

{¶ 63} As discussed previously, Section 2(C) of the OTA states that "retroactive workers' compensation insurance program refunds, rebates, or payments, whether or not the same are paid prior to or after the Effective Date" remain the property of Cambridge. As such, pursuant to the OTA, these BWC

rebates, refunds and payments belong to Cambridge and Embassy has breached the OTA by failing to remit them.

{¶ 64} Cambridge put forth evidence that the BWC rebates/refund were received by Embassy and thereby established its damages pursuant to the affidavit of George Ammar ("Ammar"), dated August 21, 2023. Ammar testified that he is the Chief Financial Officer ("CFO") of Providence Healthcare Management, Inc. ("Providence"), which provides "back-office support" services to Cambridge that includes financial and BWC management services. Attachment 1 to the affidavit is true and accurate copies of the Account Transaction History Reports prepared by the BWC for each Cambridge entity. These reports reflect various refunds/rebates from 2018-2020 related to Cambridge's participation in group rating plans, adjustments from audits related to receipt of Cambridge's payroll reports and overpayment of premiums by Cambridge.

{¶ 65} Ammar stated that, since the effective date, based on the reports in Attachment 1, Embassy has received and failed to remit funds to Cambridge from May, September and October 2020 in the amount of $120,486.315.

{¶ 66} This evidence is undisputed and establishes with reasonable certainty Cambridge's damages for Embassy's breach of the OTA regarding these funds. Reasonable minds can only come to one conclusion, that these funds belong to Cambridge under the OTA.

{¶ 67} We find that Cambridge was properly granted summary judgment regarding these BWC rebates/refunds in the amount of $120,486.315 and affirm the trial court's judgment in this regard.

**Resident Care Funds**

{¶ 68} Cambridge also moved for partial summary judgment regarding Embassy's breach of the OTA by failing to remit Resident Care Funds, which are monies paid for nursing home residents' care. Cambridge argued that these Resident Care Funds were not Transferred Assets in Section 1(A) and that they were thereby Excluded Assets pursuant to Section 1(B).

{¶ 69} Cambridge also alleges that Section 2(C) applies, which states that funds received after the Effective Date for the care of the residents that occurred before March 1, 2020 were the property of Cambridge: "[A]ll revenues and expenses accruing [in] or attributable to the period prior to the Effective Date being for the account of Exiting Operator[.]" Under the OTA Section 2(F), Embassy had 60 days to remit the Resident Care Funds it received.

{¶ 70} Cambridge put forth evidence via an affidavit from Gina Toigo ("Toigo") regarding these unpaid funds. Toigo testified that she is the Vice President of Revenue Management for Providence, who as stated above, provided back-office support for Cambridge. After the transition from Cambridge to Embassy, Providence would bill payer sources for care and services received by residents before the effective date. The payer sources would then remit payment to Embassy,

the current operator, who was then required under the OTA to transfer these funds to Cambridge.

{¶ 71} Toigo testified that from March 1, 2020 to May 31, 2020, Cambridge received sporadic funds from Embassy for payments received for the care and services delivered before the effective date. However, since June 1, 2020, Embassy has not remitted any payments of this type.

{¶ 72} Attached to Toigo's affidavit were Accounts Receivable Aging Reports, which are maintained in the ordinary course of business and reflect the claims that were billed by Providence for care and services rendered before the effective date for which payment has not been received from Embassy. Toigo testified that the amount of payments which have not been remitted by Embassy totals $2,688,521.87.

{¶ 73} This evidence is undisputed and establishes with reasonable certainty Cambridge's damages for Embassy's breach of the OTA regarding these funds. Reasonable minds can only come to the conclusion that Embassy owes these funds to Cambridge under the terms of the OTA.

{¶ 74} We find that Cambridge was properly granted summary judgment regarding these Resident Care Funds in the amount of $2,688,521.87 and affirm the trial court's judgment in this regard.

### Cost Report Funds and Bad Debt Claims

{¶ 75} Cambridge also moved for partial summary judgment regarding Cost Report Funds alleging a breach of the OTA by Embassy's failure to transfer Medicare

Cost Report Funds and Bad Debt Claims that were received by Embassy, but related to periods before the effective date. Embassy alleges Cambridge failed to produce sufficient evidence to establish these claims as a matter of law.

{¶ 76} It is undisputed that Cost Report Funds are payments made to skilled nursing home operators by Medicare Administrative Contractors ("MAC") based on an audit of the annual cost report submitted by the nursing home. After reviewing the cost report, the MAC will issue a Notice of Program Reimbursement, which sets forth the amount of allowable Medicare payments, identifying funds due to or from the nursing home.

{¶ 77} Cambridge alleges that OTA Section 4(C) governs Cost Report Funds and it provides that "[a]ny and all liability or revenue related to such pre-Effective Date final cost report or any prior cost report shall remain the sole and exclusive obligation and entitlement of Exiting Operator." We find this language clear and unambiguous.

{¶ 78} As for the Bad Debt claim under the OTA, after changing operators, an Exiting Operator is required to file a final cost report, which provides that any bad debt that would be written off or determined to be uncollectable must be included on the new nursing home operator's cost report. There is no other way for an Exiting Operator to submit claims for bad debt after filing of the final cost report.

{¶ 79} Related to the Bad Debt claim, Section 4(D) of the OTA provides that

New Operator shall pursue reasonable collection of the Bad Debt Claims, and Exiting Operator agrees to reasonably cooperate with respect thereto. In connection with such collection efforts:

. . .

>(3) New Operator agrees to include the Bad Debt Claims as reimbursable bad debt on its Medicare cost report. Upon settlement of such Bad Debt Claims, New Operator will forward all amounts attributable to such Bad Debt Claims received by New Operator to Exiting Operator within fifteen (15) days after receipt.

Further, Section 4(D) states that "New Operator covenants and agrees to continue to include the Bad Debt Claims on New Operator's Medicare cost reports until reimbursement for the Bad Debt Claims is made." This language is also clear and unambiguous.

{¶ 80} In support of its claim for breach of the OTA concerning the Cost Report Funds and Bad Debts Claims, Cambridge submitted another affidavit by Ammar, CFO of Providence, dated August 21, 2023. Concerning the Cost Report Funds, Ammar testified that attached to the affidavit were copies of the 2019 final cost reports submitted to Wisconsin Physician Services ("WPS") by MAC for three Cambridge nursing homes as of August 31, 2020. Each facility was due a refund as set forth in the cost reports. Per WPS, the Cost Report Refunds were sent to Embassy on December 16, December 18 and December 23, 2020 and total $53,406.

{¶ 81} Ammar also testified regarding the 2020 final cost reports for two of Cambridge's nursing homes for which Embassy received the refunds in two separate payments on December 18, 2020 that total $7,819.

{¶ 82} Ammar testified that Embassy has not remitted any cost report monies received by it to Cambridge even though the monies are based solely on the revenues and expenses incurred during Cambridge's operation of the nursing

homes. Per Ammar's affidavit the total amount alleged due to Cambridge for these final cost reports is $61,225.

{¶ 83} Regarding the Bad Debt Claims, Ammar testified that Providence, on behalf of Cambridge, advised Embassy of the nursing homes' Bad Debt Claims from the 2020 calendar year that were to be placed on Embassy's 2020 cost report. Cambridge had to rely on Embassy for filing the Bad Debt Claims because the nursing home provider numbers had transferred to Embassy, eliminating Cambridge's ability to file the final cost reports.

{¶ 84} Ammar also testified that on November 24, 2021, WPS confirmed that payments related to the bad debt for 2020 were paid. Ammar testified that Embassy has not remitted the bad debts monies to Cambridge and the total amount due for 2020 to Cambridge is $105,035.94, which is what is reflected in the attachments to Ammar's affidavit.

{¶ 85} Ammar further testified that Cambridge sent Embassy another bad debt claim for calendar year 2022 for inclusion in Embassy's 2022 cost report. Ammar testified that the "estimated" amount due was $14,301. We find this damage to be speculative since it is an estimate and, therefore, Cambridge cannot recover damages for this bad debt claim.

{¶ 86} The evidence put forth by Ammar for both Cost Report Funds and Bad Debt Claims is undisputed and is sufficient to establish Cambridge's damages with reasonable certainty for the Cost Report Funds and Bad Debt Claims. We find the

total undisputed amount due to Cambridge for Cost Report Funds and Bad Debt Claims is $166,260.94.

{¶ 87} A review of the trial court's July 18, 2024, judgment entry granting partial summary judgment on these claims demonstrates an error in the amount awarded. The trial court found that Cambridge was entitled to $166,260.94 for the cost report claims and $119,336.94 for Bad Debt Claims. We are unable to discern where the alleged Bad Debt Claims amount comes from as neither party mentions this amount regarding the Bad Debt Claims. We believe this was an error in the trial court's judgment.

{¶ 88} Therefore, we affirm the trial court's grant of summary judgment regarding Cambridge's claims for breach of the relevant OTA provisions for the Cost Report Funds and Bad Debt Claims awarding Cambridge $166,260.94 but vacate the trial court's award of $119,336.94 for Bad Debt Claims as there is no support for this amount in the record.

**Unjust Enrichment**

{¶ 89} Embassy argues that the trial court erred when it found Embassy liable for $78,650.28 for the unjust enrichment of Cambridge's copiers and a vehicle used by Embassy. Embassy argues Cambridge is not entitled to summary judgment on this issue as a matter of law because there is an express contract, the OTA, between the parties that governs this topic.

{¶ 90} Generally, a party cannot recover for unjust enrichment when there is a valid, enforceable contract — like the OTA — covering the subject of the dispute.

*Tanglewood Shopping Ctr., LLC v. Riser Foods Co.*, 2018-Ohio-1183, ¶ 33 (8th Dist.). However, that is not the case here because the OTA does not explicitly include instructions or terms concerning the copiers' leases or a vehicle.

{¶ 91} It is undisputed that the OTA did not specifically dictate the transfer of the copy machines' leases and facility van as items for which Embassy would assume the leases, which means Cambridge was to retain them. Despite being property of Cambridge with leases being paid by Cambridge, it is undisputed that Embassy continued to keep and use the copy machines and vehicle without any renumeration to Cambridge. As such, the claim for unjust enrichment can proceed because the OTA does not cover these items.

{¶ 92} To succeed on a claim for unjust enrichment, Cambridge has to prove that a benefit was conferred on Embassy, Embassy had knowledge of the benefit and retention of the benefit by Embassy would be unjust under the circumstances without payment. *Patel v. Krushna SS L.L.C.*, 2018-Ohio-263, ¶ 25 (8th Dist.).

{¶ 93} To support its claim for unjust enrichment, Cambridge provided another affidavit by Ammar. Ammar establishes that the copiers and van were left at the nursing home facilities after the effective date. While there, Cambridge made lease payments for the copiers and the van. After a reasonable amount of time had passed, Cambridge stopped making payments.

{¶ 94} Ammar's affidavit details the amounts paid by Cambridge per facility for copier leases after the effective date which totaled $72,743,66. Ammar testified

that Embassy continues to retain possession of the copiers without reimbursing Cambridge.

{¶ 95} As for the van, Ammar testified that Cambridge made payments totaling $5,906.72 for the van while it was in Embassy's possession. The van has since been retrieved by Cambridge, but Embassy never reimbursed Cambridge for its use of the van and payment of the lease while being used.

{¶ 96} The above facts are undisputed. As such, we find that Embassy was conferred a benefit when it retained and used the copiers whose leases Cambridge paid in part after the effective date. Cambridge also established that Embassy was conferred on a benefit when it possessed Cambridge's van, for which Cambridge paid the lease, without reimbursement. Cambridge has put forth undisputed evidence that Embassy had knowledge of these benefits especially considering the amount of communications between the two concerning the properties. Last, we find that under the circumstances, it is unjust for Embassy to retain these copiers and use Cambridge's van without reimbursing Cambridge.

{¶ 97} Therefore, we find that Cambridge has put forth sufficient evidence to establish it is entitled to judgment as a matter of law concerning its claim for unjust enrichment. Reasonable minds can only come to the conclusion that Embassy has been unjustly enriched by retaining these copiers and the vehicle.

{¶ 98} As such, we find the trial court properly granted Cambridge's motion for partial summary judgment regarding its claim for unjust enrichment awarding $78,650.38 for both the copiers and the van's lease payments.

**Conversion**

{¶ 99} Embassy alleges the trial court erred when it granted Cambridge's motion for partial summary judgment in regard to its conversion claims. We agree.

{¶ 100} In its partial motion for summary judgment, Cambridge alleged Embassy converted the above described BWC Funds, Resident Care Funds, the Cost Report Funds and the copiers and van.

{¶ 101} "'The elements of a conversion cause of action are (1) plaintiff's ownership or right to possession of the property at the time of conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages.'" *Dream Makers v. Marshek*, 2002-Ohio-7069, ¶ 19 (8th Dist.), quoting *Haul Transport of Va., Inc. v. Morgan*, 1995 Ohio App. LEXIS 2240 (2d Dist. June 2, 1995).

{¶ 102} "A claim of conversion must be based on the taking of identifiable personal property." *Beavers v. PNC Bank, Natl. Assn.*, 2013-Ohio-5318, ¶ 29 (8th Dist.), citing *Landskroner v. Landskroner*, 2003-Ohio-5077, ¶ 27 (8th Dist.). Furthermore, "'insofar as [a] conversion claim is based on the collection of monies in violation of [an] Operating and/or Purchase Agreements, it fails as a matter of law.'" *ODW Logistics, Inc. v. Karmaloop, Inc.*, 2014 U.S. Dist. LEXIS 9615, *13 (S.D. Ohio Jan. 27, 2014), quoting *Academic Imaging, LLC v. Soterion Corp.*, 352 Fed.Appx. 59, 67-68 (6th Cir. 2009).

{¶ 103} In *Landskroner* at ¶ 27, this court found that "[b]ecause the property subject to appellant's conversion claim is not identifiable, personal property but

rather comprises monies appellant claims are due and owing him under an agreement, appellant can prove no set of facts that would entitle him to recover on his claim for conversion." *See Marshall v. Cooper*, 2017-Ohio-5813, ¶ 16 (8th Dist.) (applied *Landskroner* and sustained appellant's breach-of-contract claim and then found summary judgment was appropriate as to the appellant's conversion claim since it fell within the ambit of *Landskroner* and therefore overruled the conversion assignment of error).

{¶ 104} Here, Cambridge's conversion claim for BWC Refunds, Resident Care Funds, Cost Report Funds and Bad Debt monies plainly falls within the ambit of *Landskroner* as this claim is comprised of monies Cambridge claimed are due and owing under the OTA. There is no legal duty independent from the OTA regarding these funds. As such, this claim is barred by the holding in *Landskroner* and the assignment of error is properly overruled as to the above assets/claims.

{¶ 105} The only remaining possible basis for a conversion claim is for the personal property retained by Embassy, i.e., the copiers and vehicle, which we found were not covered by the OTA. The affidavit of Ammar established that the vehicle was retrieved by Cambridge so the conversion claim can only proceed for the copiers. This too, however, must fail as Cambridge established in Ammar's affidavit that it stopped making lease payments for the copiers. Once it stopped making lease payments, Cambridge lost the right to possess the copiers and, therefore, is unable to establish a conversion claim as a matter of law regarding them. *Dream Makers*, 2002-Ohio-7069, at ¶ 19.

{¶ 106} We find the trial court erred in granting Cambridge summary judgment for its conversion claim. We sustain in part this cross-assignment of error as it concerns Cambridge's claims for conversion and vacate the trial court's judgment granting Cambridge conversion claim.

## Permanent Injunction and Declaratory Judgment

{¶ 107} Cambridge's partial motion for summary judgment also had claims for a permanent injunction and a declaratory judgment. However, in Embassy's second assignment of error, it does not make any arguments or raise any issues that the trial court erred in granting Cambridge a permanent injunction or declaratory relief. As such, we will not review those claims.

## Embassy's Fifth and Sixth Cross-Assignments of Error

{¶ 108} In its fifth and sixth cross-assignments of error, Embassy alleges that the trial court erred in awarding punitive damages and attorney's fees as damages in regard to Cambridge's conversion claim where the court found Embassy converted BWC funds, Resident Care Funds, Cost Report Funds, Bad Debt monies, copies and vehicle.

{¶ 109} Based on our disposition of Cambridge's conversion claim, we find the trial court erred in awarding punitive damages and attorney's fees because Cambridge is unable to succeed on a conversion claim as a matter of law and is, therefore, not entitled to recover these damages or awards.

{¶ 110} We sustain Embassy's fifth and sixth assignments of error and vacate the trial court's award of punitive damages and attorney's fees.

**Embassy's Third and Fourth Cross-Assignments of Error**

{¶ 111} Embassy's third cross-assignment of error alleges that the trial court erred in denying Hander and Repchick's motion for judgment notwithstanding the verdict ("JNOV") regarding Cambridge's civil conspiracy claim. We agree.

### Standard of Review

{¶ 112} Motions for JNOV are governed by Civ.R. 50(B). A motion for JNOV challenges the legal sufficiency of the evidence. *Austin v. Chukwuani,* 2017-Ohio-106, ¶ 19 (8th Dist.). "The trial court does not weigh or consider the credibility of the witnesses, but rather, reviews and considers the sufficiency of the evidence as a matter of law." *Siebert v. Lalich*, 2006-Ohio-6274, ¶ 15 (8th Dist.). A motion for JNOV should only be granted if the movant is entitled to judgment as a matter of law when the evidence is construed most strongly in favor of the nonmovant. *Id.* at ¶ 14. This court employs a de novo standard of review in evaluating the grant or denial of a motion for JNOV. *Austin* at ¶ 19.

{¶ 113} To establish civil conspiracy, Cambridge must prove "(1) a malicious combination of two or more persons, (2) causing injury to another person or property, and (3) the existence of an unlawful act independent from the conspiracy itself." *Kelley v. Buckley*, 2011-Ohio-1362, ¶ 70 (8th Dist.), citing *Williams v. Aetna Fin. Co.,* 83 Ohio St.3d 464 (1998).

{¶ 114} Regarding the third element, "'the underlying unlawful act must be a tort.'" (Citations omitted.) *Bindra v. Fuenning*, 2013-Ohio-5722, ¶ 15 (9th Dist.); *see also LaSalle Bank, N.A. v. Kelly*, 2010-Ohio-2668, ¶ 33 (9th Dist.).

{¶ 115} Because plaintiff failed to state a viable tort claim for the unlawful act element, his civil conspiracy claim likewise fails as a matter of law. *Woods v. Sharkin*, 2022-Ohio-1949, ¶ 69 (8th Dist.), citing *Mills v. Westlake*, 2016-Ohio-5836, ¶ 48 (8th Dist.) ([P]laintiff's failure to show the "existence of an unlawful act independent from the actual conspiracy" is "fatal to her civil conspiracy claim.").

{¶ 116} Here, at trial, the underlying unlawful act element was based on the trial court's finding of Cambridge's claim of conversion. However, based on our finding of error regarding the conversion claim, Cambridge's claim for civil conspiracy must also fail as a matter of law as it is unable to establish the occurrence of a tort as the underlying unlawful act. *Woods* at ¶ 69.

{¶ 117} We find the trial court erred when it denied Embassy's motion for JNOV regarding the claim of civil conspiracy between Repchick and Handler as Cambridge was unable to succeed on a civil conspiracy claim as a matter of law. We sustain Embassy's third cross-assignment of error and thereby vacate the jury's award of $505,000 and the trial court's judgment entry to that affect.

{¶ 118} Furthermore, because the civil conspiracy claim should have never been submitted to the jury, we find Embassy's fourth assignment of error concerning the denial of a motion for a new trial based on allegedly errant jury instructions for civil conspiracy claim as moot. *See* App.R. 12(A)(1)(C).

{¶ 119} Judgment affirmed in part, reversed in part and vacated in part.

It is ordered that appellants and appellees share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, ADMINISTRATIVE JUDGE

EMANUELLA D. GROVES, J., CONCURS;
MICHAEL JOHN RYAN, J., DISSENTS IN PART AND CONCURS IN PART (WITH SEPARATE OPINION ATTACHED)

MICHAEL JOHN RYAN, J., DISSENTING IN PART AND CONCURRING IN PART:

{¶ 120} Respectfully, I dissent in part and concur in part. I dissent as to the majority's resolution of Cambridge's sole assignment of error and would affirm the trial court's judgment finding that the BWC distributions were not excluded assets under the OTA. I concur with the majority as to Embassy's cross-assignments of error.

{¶ 121} Cambridge claimed the BWC distributions are refunds and/or reimbursements relating and attributable to the period prior to the effective date of the OTA, are retroactive workers' compensation insurance program refunds or reimbursements, and are excluded assets that belong to Cambridge.

{¶ 122} According to Cambridge, the amount of the distributions was based upon Cambridge's workmen's compensation insurance premium payments in 2018

and 2019. BWC's use of the amount of premiums paid in policy years 2018 and 2019 does not mean that those distributions were refunds or reimbursements for policy years 2018 and 2019. The distributions were sent in 2020, shortly after COVID-19 was declared a pandemic. Embassy argued that the State used the premiums paid to BWC as the formula for calculating how much each eligible employer would get back. This makes sense. While the State may reimburse and/or refund insurance payments, it is doubtful that the State would reimburse or refund 100 percent plus 372 percent of a paid premium for one year of premiums paid. The more logical conclusion is that the money was to help businesses stay afloat during the COVID-19 pandemic.

{¶ 123} I agree with Embassy that the payments were made only because of Ohio's unprecedented relief efforts to support employers navigating COVID-19 financial hardships that definitively occurred after the effective date of the OTA. Therefore, I would find that the trial court was correct in finding that the payments were not excluded assets under the OTA .